UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETWORTH HOLDINGS, LLC, *et al.*,

    Plaintiffs,

    v.

MURIEL BOWSER, *et al.*,

    Defendants.

Civil Action No. 18-3 (JEB)

## MEMORANDUM OPINION

Although cities seek to attract destination restaurants and desirable retail, they must also keep the more prosaic needs of their citizenry in mind. For example, fearing the rapid disappearance of full-service gas stations from the District of Columbia, the D.C. City Council passed the Retail Service Station Act (RSSA) in 1976 to ban the conversion of such gas stations to limited-service stations. This moratorium was reauthorized ten times and made permanent in 2005.

In recent years a different threat emerged: District gas stations were disappearing altogether as developers converted them into more lucrative commercial and residential properties. Seeking to combat this threat, the City Council amended the RSSA in 2014-15 to expand its reach. Plaintiffs Petworth Holdings, LLC and John Formant, the owners of a property containing a full-service Shell gas station, are convinced that these amendments have hindered their ability to sell their property. They have thus now sued, seeking a declaration that the amended RSSA violates the Fifth and Thirteenth Amendments of the U.S. Constitution and an injunction barring Defendants Muriel Bowser, Karl A. Racine, Tommy Wells, and the District of Columbia Gas Station Advisory Board from enforcing it.

1

Arguing that Plaintiffs have no standing to challenge the RSSA and that, in any event, it violates neither constitutional amendment, Defendants have now moved to dismiss. Finding that Plaintiffs have standing to sue and have sufficiently stated a plausible Fifth Amendment claim, but not one under the Thirteenth Amendment, the Court will grant in part and deny in part Defendants' Motion.

## I. Background

### A. Statutory Background

According to the Complaint, which the Court must presume true for purposes of this Motion, our story begins with the New Columbia Statehood Initiative and Omnibus Boards and Commission Reform Amendment Act of 2014 (the "Act"). See D.C. Code § 36-304.01; Compl., ¶ 18. The Act amended a longstanding D.C. statute regulating the alteration and conversion of full-service gas stations in the District – the Retail Service Station Act. See Compl., ¶¶ 18-20. The RSSA, which imposed a moratorium on the conversion of full-service gas stations to limited-service gas stations, was initially passed in 1976 and was then reauthorized every five years until it was made permanent in 2005. See MTD at 1-2. The Act amended the RSSA by inserting two important additions: the word "discontinued" and the phrase "or into any other use." Compl., ¶ 19. Following the amendments, the RSSA now provides: "No retail service station which is operated as a full service retail service station on or after April 19, 1977, may be discontinued, nor may be structurally altered, modified, or otherwise converted . . . into a non full service facility or into any other use." Id., ¶ 21; D.C. Code § 36-304.01(b) (emphasis added).

The RSSA does provide a process through which parties can seek an exemption from its prohibitions by application to the Gas Station Advisory Board. The GSAB, after receiving an exemption application, determines whether it should be granted and makes a recommendation to

2

the Mayor accordingly. See D.C. Code § 36-304.01(d). The GSAB, however, appears not to be currently operational: it has no employees, no physical office space, and no members have been appointed to it for the last 11 years. See Compl., ¶¶ 29-31.

Although the Act was passed by the D.C. City Council in October 2014, it was never signed by newly elected D.C. Mayor, Muriel Bowser, but was deemed approved without her signature in January 2015 and became effective in May of that year. Id.., ¶ 18. In November 2014, meanwhile, the City Council passed an emergency bill making the Act effective immediately. Id., ¶ 26. Although outgoing Mayor Vincent Gray signed the emergency bill, he stated that he did so only "because [he] received assurances that the City Council [would] advance legislation amending these flawed provisions," which "may violate the Fifth Amendment by 'taking' a retail service station owner's property without just compensation." Compl., Exh. A (Vincent Gray Letter) at 2. The City Council later passed three different bills in 2015 and 2016 attempting to address Mayor Gray's concerns, but Mayor Bowser refused to sign any of them into law, noting each time that the Act failed to provide a "fair, transparent, and constitutional process" for "gas station owners." Compl., Exh. B (Nov. 23, 2015, Muriel Bowser Letter) at 2.

B.     The Current Action

Plaintiffs are the owners of a lot at 4140 Georgia Avenue N.W. in Washington, which contains a Shell "full service retail service station." Compl., ¶¶ 3-6. Having initially purchased the Property from DAG Petroleum Suppliers LLC in 2005, they are currently leasing it back to DAG, who, along with several sub-lessees, operates the station and several other businesses on site. Id., ¶¶ 5, 14. Intending to develop the Property, Plaintiffs initially filed and were granted approval on a Planned Unit Development application in 2006. Id., ¶ 15. These plans were later postponed by the 2007-08 financial crisis. Id., ¶ 16. In 2014, Plaintiffs made a decision to sell

3

the Property and solicited bids from potential purchasers and developers. Yet, as just discussed, that same fall, the D.C. City Council passed the Act. Believing that the Act "vastly expanded the scope of the [RSSA]," Plaintiffs brought this suit, claiming that the RSSA now prevents them or any potential owner of the Property from ever closing down the gas station and redeveloping the Property for another purpose. Id., ¶ 22. As a result, Plaintiffs allege that the Act "substantially hinder[s]" the sale of the Property, as "potential purchasers of the Property have stated that they would not purchase the Property if they were required to operate a full-service [gas station] . . . in perpetuity." Id., ¶¶ 35-36. Plaintiffs seek a declaration that the Act violates the Fifth and Thirteenth Amendments of the U.S. Constitution and an injunction barring Defendants from enforcing it. Defendants have now moved to dismiss.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant [P]laintiff[s] 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005). The pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact. Sparrow, 216 F.3d at 1113.

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain

4

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). A court need not accept as true, then, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)). For a plaintiff to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

The standard to survive a motion to dismiss under Rule 12(b)(1) is less forgiving. Under this Rule, Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to hear their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). A court also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)). Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005).

**III.    Analysis**

As it must address jurisdictional concerns first, the Court begins with Defendants' assertion that Plaintiffs have no standing. It moves next to an analysis of Plaintiffs' Fifth Amendment claim and concludes with the Thirteenth Amendment.

    A.    <u>Standing</u>

Article III of the United States Constitution limits the jurisdiction of the federal courts to resolving "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." <u>Lujan</u>, 504 U.S. at 560. To have standing, a party must, at a constitutional minimum, meet the following criteria. First, the plaintiff "must have suffered an 'injury in fact' – an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" <u>Id.</u> (internal citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" <u>Id.</u> (alterations in original) (citation omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Id.</u> at 560-61 (citation omitted). A "deficiency on any one of the three prongs suffices to defeat standing." <u>US Ecology, Inc. v. U.S. Dep't of Interior</u>, 231 F.3d 20, 24 (D.C. Cir. 2000). "For purposes of demonstrating standing, [Plaintiffs] need not convince this court that [their] interpretation [of the RSSA] is correct. Rather, [Plaintiffs'] standing depends upon whether [their] interpretation . . . is <u>non-frivolous</u>." <u>Ark Initiative v. Tidwell</u>, 749 F.3d 1071, 1076 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

Here, Defendants maintain that Plaintiffs lack standing because (1) they have not suffered an injury-in-fact that is (2) traceable to the District of Columbia. The Court will address each of these challenges in turn and conclude by examining redressability, the final prong in a standing analysis.

1. *Injury-in-Fact*

Defendants' first argument is that the RSSA cannot injure Plaintiffs because it does not apply to them as owners of the Property who do not operate the gas station. Defendants alternatively maintain that even if the RSSA does apply to Plaintiffs, they have not suffered any injury here. The Court cannot concur on either score.

The RSSA provides, in relevant part, that "[n]o retail service station which is operated as a full service station on or after April 19, 1977, may be discontinued, nor may be structurally altered, modified or otherwise converted . . . into a non full service facility or into any other use." D.C. Code § 36-304.01(b). On its face, this provision does not limit the RSSA's applicability to any particular party. Rather, it announces a general prohibition on the discontinuation, alteration, modification, or conversion into a non-full-service facility or any other use without mentioning either "owners" or "operators." If, as Defendants assert, the RSSA is inapplicable to Plaintiffs – *i.e.*, property owners who lease service facilities to station operators – then the RSSA would be rendered ineffective. In other words, if all of its provisions were inapplicable to owners like Plaintiffs, then they would be able to cancel their leases and modify or raze their full-service gas stations at will. This legislative outcome would be illogical, and Defendants' reading is thus unlikely to have been the one the City Council had in mind when passing the Act.

The RSSA, in addition, provides that "[a]ny owner or operator of a retail service station who converts or causes the conversion of [a] retail service station without procuring an

7

exemption" shall be guilty of a civil infraction and fined accordingly. See D.C. Code § 36–304.01(g)(2). Believing that this provision defines the applicable scope of the RSSA, Defendants contend that because Plaintiffs are merely "property owners" – and not "owners" or "operators" of a full-service station – the RSSA does not apply to them. See Reply at 2-3. Even if this subsection controlled, instead of (b) quoted above, Plaintiffs still qualify as "owners" under the Code. They allege, and Defendants do not contest, that they own the Property and "its improvements" – including the "full service retail service station." Compl., ¶¶ 4-6 (noting Plaintiffs "purchased the Property and Station"). The Property and gas station are currently leased to an "operator" – DAG – but that does not alter their underlying ownership status. Id., ¶¶ 5-6. The RSSA in fact contemplates this scenario: the Code addresses these two different property relationships to a gas station and makes regulatory distinctions between owners' and operators' obligations under the Code. For example, § 36–304.01(c) imposes requirements exclusively on "operators" or persons who "control [] the operation" of retail service stations with regard to the range of services they must offer. This targeting makes perfect sense – only operators or those who control operations exercise authority over what types of services they offer. On the other hand, the Code's provisions pertaining to applicable fines and punishments for violations of the Code apply to both "owners" and "operators" of service stations, see D.C. Code § 36–304.01(g)(2), (3), as both could engage in conduct that violates the RSSA's provisions.

Having established that the RSSA is applicable to Plaintiffs, the next question is whether they have been injured as a result. The Court answers in the affirmative because they cannot sell the Property, which inability economically harms them. Because the Court must treat Plaintiffs' factual allegations as true at this stage, their assertions that the RSSA clouds the Property's title

8

sufficiently so as to render it unattractive to lenders for financing must be taken at face value. Much like in the context of zoning cases, the Act removes a "stick" from Plaintiffs' "bundle" of property rights – namely, as explained below, their ability to raze the service station. Given that "[t]here is a substantial body of law recognizing that the owner of an interest in [an] affected property has standing to challenge the restriction," von Kerssenbrock-Praschma v. Saunders, 48 F.3d 323, 326 (8th Cir. 1995) (collecting cases), and Plaintiffs have demonstrated that an interest in their Property has been affected by the Act, they have shown sufficient injury.

2. *Causation*

"Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (*en banc*) (internal citations omitted). Defendants argue that "many factors having nothing to do with the RSSA could have negatively affected [P]laintiffs' attempts to sell the [P]roperty." Reply at 7. Although this may be true, Plaintiffs are not required to show that "the defendant's actions are the very last step in the chain of causation." Bennett v. Spear, 520 U.S. 154, 169 (1997). In this case, Plaintiffs have sufficiently alleged that their inability to sell the Property is not largely the result of the independent action of some third party – namely, the unwilling lenders and buyers – but is "produced by [the] determinative or coercive effect [of the RSSA restrictions] upon the[ir] action[s]." Id. That is enough.

3. *Redressability*

Although Defendants have not raised the issue of redressability, the Court nonetheless should address it. Am. Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005) ("It is well established that a federal court cannot act in the absence of jurisdiction . . . and that jurisdictional

9

issues may be raised by the court *sua sponte*."). "In order to determine redressability, the court must examine 'whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged.'" Cty. of Delaware, Pa. v. Dep't of Transp., 554 F.3d 143, 149 (D.C. Cir. 2009) (quoting Fla. Audubon Soc'y, 94 F.3d at 663-64 (footnote omitted)). Here, Plaintiffs seek a declaration that the RSSA, as amended by the Act, unconstitutionally restricts them and an injunction barring Defendants from enforcing it against them. As Plaintiffs have repeatedly alleged, a severe obstacle to the sale of their property is the RSSA's moratorium on its redevelopment. See Compl., ¶¶ 35-36, 44 ("[P]otential purchasers of the Property have stated that they would not purchase the Property if they were required to operate a full-service retail service station on the Property in perpetuity."). In the event that the Court ruled in Plaintiffs' favor, their injury – the cloud on their title – will be alleviated. As such, they have satisfied the third prong of the Court's standing analysis.

    B.    Fifth Amendment

Moving now to the merits, the Fifth Amendment of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014 (1992) (citation omitted). Unable to develop a set formula for determining how far is too far, the Supreme Court has explained that "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances [in that] case." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978) (citation omitted). The Penn Central Court adopted a balancing test that can be boiled down to several factors. "Primary among those factors" are: the regulation's economic impact

on the claimant and, "particularly," the extent to which the regulation interferes with the "claimant's distinct investment-backed expectations." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538-39 (2005) (quoting Penn Central, 438 U.S. at 124). The Supreme Court has also suggested that "the character of the government action . . . may be relevant in discerning whether a taking has occurred." Id. Additionally, it has carved out two categories of cases where the Penn Central balancing analysis does not apply because a *per se* taking has occurred: (1) when a regulation entirely wipes out the economic value of a property, Lucas, 505 U.S. at 1015 (collecting cases); or (2) when a regulation compels the owner to suffer a physical "invasion" of his property. Id. (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)).

Although Plaintiffs appear to rely substantially on these last two categories, the Court need not discuss them since their claim under the Penn Central test is sufficient to survive the Motion.

> 1. *Character of Government Action*

For a period of time, most courts interpreted the "character of the government action" prong as incorporating a means-ends test that evaluated the underlying effectiveness and purpose of the regulation at issue. In this vein, Defendants argue that the RSSA is a reasonable means of achieving a rational goal. See MTD at 13. Unfortunately for them, the Supreme Court rejected this approach in Lingle. See 544 U.S. at 548. Defendants' attempts to smuggle this abandoned doctrine into the first prong of the Penn Central analysis, and all of their supporting citations, which are to pre-Lingle cases, are thus beside the point.

Lingle concededly offered scant words of guidance on how courts should apply the "character" prong of the Penn Central test, other than to reaffirm that "the 'character of the government action' – for instance whether it amounts to a physical invasion or instead merely

11

affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good' – may be relevant[.]" Id. at 539. Courts interpreting this limited guidance have set off in a number of different directions: some have held that the "character" factor is limited to physical invasions and similar situations, others have analyzed it as an inquiry into whether a small number of property owners have been unfairly burdened, and still others have held that Lingle left some version of a public-interest/private-harm balancing test intact. See Michael Lewyn, Character Counts: The "Character of the Government Action" in Regulatory Takings Actions, 40 Seton Hall L. Rev. 597, 610-13 (2010) (collecting cases).

Here, the "character" of this action seems to go beyond the sort of mine-run restrictions that "involve a balancing of [] private economic interests," Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 485 (1987), or merely "prohibit[] a beneficial use of the property." Penn Central, 438 U.S. at 124 (emphasis added). Instead, it requires Plaintiffs to retain physical elements of their property – namely, the full-service station and all its components. But to the extent this factor is only "relevant," Lingle, 544 U.S. at 539, when "the interference with property can be characterized as a physical invasion by government," Penn Central, 438 U.S. at 124, it does little to advance Plaintiffs' cause. The District's regulation falls short of a direct "physical appropriation of [Plaintiffs'] property," Keystone Bituminous Coal, 480 U.S. at 489 n.18, so they must seek refuge in another, more "[p]rimary" factor. Lingle, 544 U.S. at 539.

    2. *Impact on Claimant*

A "regulation's economic effect upon the claimant may be measured in several different ways," Dist. Intown Properties Ltd. P'ship v. D.C., 198 F.3d 874, 879 (D.C. Cir. 1999) (collecting cases), but generally "a claimant must put forth striking evidence of economic effects

12

to prevail." Id. at 883. Although Plaintiffs allege that the Act "effectively prohibits [them] from selling the Property," Compl., ¶ 29, and provide an affidavit supporting this contention, see Baschuk Affidavit, this evidence, while sufficient for the purposes of alleging an injury under the Court's standing analysis, does not meet the more demanding requirements of this prong. As Defendants correctly point out, Plaintiffs have failed to provide facts alleging any "decrease in property value" or evidence that the "property no longer provides a reasonable rate of return." MTD at 11-12. While Plaintiffs have clearly been adversely affected by the Act, they have not alleged any quantifiable economic harm. Indeed, they are presumably still receiving income from their lessees and have not pointed to a decrease in profit or quantified a loss in property value. See, e.g., Keystone Bituminous Coal, 480 U.S. at 495-96 (looking to whether regulation made business "commercially impracticable"); Penn Cent., 438 U.S. at 131 (reviewing the Court's decisions upholding regulations despite diminution in a property's value of more than 75%). As such, this factor cuts against Plaintiffs.

### 3. *Interference with Reasonable Investment-Backed Expectations*

"A reasonable investment-backed expectation 'must be more than a unilateral expectation or an abstract need.'" Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)). Plaintiffs, moreover, "cannot establish a takings claim 'simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development.'" Dist. Intown Properties, 198 F.3d at 879 (quoting Penn Cent., 438 U.S. at 130).

Defendants here argue that because Plaintiffs purchased the Property in 2005 – *i.e.*, after the RSSA had been amended to render the moratorium permanent – they could not have reasonably expected to develop it. See MTD at 12. Although Defendants are correct insofar as

13

Plaintiffs may not have reasonably expected to receive an exemption from the moratorium, they could have reasonably expected to be able to raze the property entirely or sell it to another developer who could do the same.

At the time Plaintiffs purchased the property, the RSSA only prohibited retail service stations from being "structurally altered, modified, or otherwise converted . . . into a non-full service facility." D.C. Code § 36-304.01(b). The 2014 Act, as discussed, amended the RSSA to prohibit a full-service station from being "discontinued" or from being converted to "any other use." DC Act Number 20-615. Contrary to Defendants' arguments that the "RSSA's moratorium has been interpreted in similar ways since its enactment," the 2014-15 amendments are best interpreted to have expanded the limitations imposed by the RSSA. See Reply at 11-12 ("By this language the Act prohibits any kind of conversion to something less than a full service station.") (quoting Opinions of the Corporation Counsel (Sept. 22, 1980), 1980 D.C. AG LEXIS 51, *2). A plain reading of the pre-2014 version of the RSSA alone makes this evident – the restrictions on structurally altering, modifying, or converting the stations are limited only to those changes resulting in a "non-full service facility." Defendants' own evidence supports this reading: as D.C.'s Corporation Counsel explained in 1981, "[N]othing in [the RSSA] would prohibit one from razing a full service retail service station and simply going out of business." See Reply at 13 (quoting Opinions of the Corporation Counsel (Jan. 6, 1981), 1981 D.C. AG LEXIS 1, *2). That the amendments represented a substantive change to the law is buttressed by the fact that two separate mayoral administrations viewed the Act as making meaningful alterations to the scope of the RSSA. See Gray Letter; Bowser Letter. As a result, they either refused to sign the legislation or expressed their concern that the amended RSSA violated the Fifth Amendment. Id.

In response, Defendants argue that Plaintiffs should have expected the "regulation of full-service gas stations to impact their use of the property." MTD at 12. Citing to Circuit caselaw, Defendants maintain that "[b]usinesses that operate in an industry with a history of regulation have no reasonable expectation that regulation will not be strengthened to achieve established legislative ends." Id. (quoting Dist. Intown Properties, 198 F.3d at 884). Although this may be true in the abstract, the 2014-15 amendments at issue here were not so clearly connected to previous legislative goals so as to be reasonably factored into Plaintiffs' 2005 investment decision. The Act was intended to address a different concern from the initial RSSA and implied a fundamental shift in DC's regulatory goals: not simply to prevent the downgrading of full-service gas stations to non-full-service facilities, but to prevent the removal of gas stations from the District altogether. As explained above, the original RSSA was intended "to stop the growing trend of converting stations to non-full service stations." MTD, Exh. 1 (1979 Committee Report); see also id., Exh. 2 (2004 Committee Report) at 3 ("The Council first adopted the moratorium in response to the continuing trend away from full-service gas stations to non-full-service stations . . . That trend continues today."). Indeed, the City Council's discussion leading up to the permanent reauthorization of the RSSA focused exclusively on the benefits of the full-service components the moratorium would protect. See 2004 Report at 3 ("The District's retail service station dealers support the moratorium on conversions . . . [because] the economics of conversion favor the oil companies . . . [as] [g]as station operators make less profit off gasoline sales than they do off of automotive repairs. . . [The RSSA] also benefits District residents by ensuring that they continue to have access to full automotive services at neighborhood gas stations.") (emphasis added). The 2014 amendments, on the other hand, had a different objective – they modified the moratorium so as to prohibit a full-service retail station

15

"from going out of business and shutting the station down." Compl., Exh. C (D.C. AG Karl Racine Letter) at 3.

The Act dramatically narrowed the options available to an interested buyer; he could no longer raze a property and start from scratch in order to unlock the value of a more profitable use. Given the availability of the "razing" option at the time of Plaintiffs' purchase and their inability to foresee its vitiation, they have sufficiently pled that the amendments frustrated their reasonable investment expectations.

* * *

In sum, although Plaintiffs failed to plead sufficient facts specifically alleging a measurable economic impact to their property, their strong showing on the final and most important Penn Central factor – the extent to which the regulation interferes with the "claimant's distinct investment-backed expectations" – nudges them over the relatively low hurdle of a motion to dismiss. Having "carefully examin[ed] and weigh[ed] all the relevant circumstances," Tahoe-Sierra, 535 U.S. at 322 (internal quotation marks and citations omitted), the Court finds it appropriate to deny Defendants' Motion with regards to Plaintiffs' Fifth Amendment count.

C. Thirteenth Amendment

Claiming that they are being subjected "to a condition of involuntary servitude," Plaintiffs rather boldly allege that the amended RSSA also violates their Thirteenth Amendment rights. See Compl., ¶¶ 47-49. This implausible avenue of relief is a dead end. Even if they could sue for declaratory and injunctive relief under the Thirteenth Amendment, and "[c]ourts in this Circuit have consistently held that there is no private right of action under the Thirteenth Amendment," Doe v. Siddig, 810 F. Supp. 2d 127, 135 (D.D.C. 2011), Plaintiffs have not alleged sufficient facts to state a valid claim. The Supreme Court has explained that "the term

16

'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." United States v. Kozminski, 487 U.S. 931, 952 (1988). As "Plaintiffs['] allegations do not describe any compulsory labor [they were] forced to endure at the hands of the defendants," they have no viable claim under the Thirteenth Amendment. Richards v. Duke Univ., 480 F. Supp. 2d 222, 238 (D.D.C. 2007) (citing Kozminski, 487 U.S. at 943-44).

No court has extended the reach of the Thirteenth Amendment this far, and the Court is unwilling to be the first. See Midwest Retailer Associated, Ltd. v. City of Toledo, 563 F. Supp. 2d 796, 809 (N.D. Ohio 2008) ("The contemporary view is that involuntary servitude claims, to be cognizable, relate to extreme cases, such as labor camps, isolated religious sects, and forced confinement."); Serpentfoot v. Rome City Comm'n, 322 F. App'x 801, 806 (11th Cir. 2009) (rejecting Thirteenth Amendment challenge to building code); Derksen v. Fond du Lac Cty., 2007 WL 2325357, at *1 (E.D. Wis. Aug. 14, 2007) (finding Thirteenth Amendment challenge to county septic regulations "meritless"); Borne v. Estate of Carraway, 118 So. 3d 571, 586–87 (Miss. 2013) (finding Thirteenth Amendment challenge to court order requiring repair of culvert system "patently meritless"); Sobel v. Higgins, 151 Misc. 2d 876, 881 (N.Y. Sup. Ct. 1991) (noting longstanding rejection of Thirteenth Amendment challenges to rent-control laws).

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss as it pertains to Plaintiffs' Fifth Amendment claim but will grant it with regard to the Thirteenth Amendment count. A separate Order consistent with this Opinion shall issue this day.

Date: April 20, 2018

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge