**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PETWORTH HOLDINGS, LLC,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 18-3 (JEB)** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

With great ambitions of turning a profit, Plaintiff Petworth Holdings, LLC acquired a lot in Northwest Washington about fifteen years ago.  Although a full-service gas station was situated there, Plaintiff wanted to ultimately convert the lot to a residential property or sell it to someone else to do the same.  The D.C. Council had ambitions of its own: ensuring that, as the city grows, it maintains a sufficient number of full-service stations to handle vehicle repairs.  Pursuing this goal, the Council in 2015 amended the longstanding Retail Service Station Act — which had, since 1977, regulated the alteration and conversion of full-service stations — to prohibit the discontinuation of the stations altogether.  With its real-estate dreams stymied, Petworth and one of its principals filed this suit against the District and some of its officials, contending that the amended RSSA violates the Fifth Amendment to the U.S. Constitution by taking their property without providing just compensation.  Each side now moves for summary judgment.  Because each has some gas in the tank, the Court grants in part and denies in part the Cross-Motions.

## I.   Background

The Court has previously set forth the underlying facts of the case and assumes the reader's familiarity with those Opinions.  Petworth Holdings, LLC v. Bowser, 308 F. Supp. 3d 347, 350–51 (D.D.C. 2018) (granting in part motion to dismiss); see also Petworth Holdings, LLC v. Bowser, 333 F.R.D. 297, 298 (D.D.C. 2019) (granting motion to amend Complaint).  For purposes of the current Cross-Motions, the relevant facts are largely undisputed.  In brief, Nantucket Holdings, Ltd. purchased a lot that contained a full-service gas station from DAG Petroleum Suppliers, LLC for $2.5 million in 2005.  See ECF No. 58-1 (Pl. Resp. to Def. Statement of Facts), ¶ 9; see also ECF No. 60-18 (Def. Resp. to Pl. Statement of Facts), ¶ 9. Nantucket Holdings subsequently assigned ownership of that lot, located at 4140 Georgia Avenue, N.W., to Plaintiff Petworth Holdings, LLC in September 2005.  See PRDSF, ¶¶ 9, 11; DRPSF, ¶ 8.  Although John Formant, one of Petworth's two principals is also a plaintiff here, see PRDSF, ¶ 11, DRPSF, ¶ 85, the Court, for ease of reference, will refer to them jointly as Petworth.  Since the purchase, Petworth has leased the property back to DAG, which owns the gas pumps, storage tanks, and buildings on the land, and actually operates the service station. See ECF No. 51-7 (Deposition of Christofilos Tsintolas) at 55:1–20; PRDSF, ¶ 13.

Petworth acquired the property with the intention of developing it.  See DRPSF, ¶¶ 13–19.  Pursuant to those plans, it filed a Planned Unit Development application in 2006, which the D.C. Zoning Commission approved in 2007.  Id.  The global financial crisis of 2007–08 and subsequent recession halted Petworth's development efforts, however.  Id., ¶ 25; see also Tsintolas Depo. at 141:2–11.  By 2014, the PUD permit had expired and Petworth began seeking bids from potential purchasers and developers.  See DRPSF, ¶¶ 28, 30.  Those sale discussions ran smack into a roadblock: the District's RSSA.

The RSSA regulates the alteration, conversion, and certain business operations of full-service retail gas stations.  As opposed to those entities that merely have gas pumps, a full-service station is one that has a garage or similar space for repair, maintenance, and service work.  See D.C. Code § 36–304.01(a)–(b).  The Act came into being in 1977 as a temporary moratorium on conversions from full-service stations to non-full-service stations, see D.C. Law 1–123, § 5-301, 24 D.C. Reg. 2371 (Apr. 19, 1977), and the D.C. Council repeatedly reauthorized the prohibition until making it permanent in 2005.  See D.C. Law 15-297, § 2(d), 52 D.C. Reg. 1485 (Feb. 18, 2005); e.g., D.C. Law 3-44, § 2(c)(2), 26 D.C. Reg. 2093 (Nov. 9, 1979) (through Oct. 1, 1981); D.C. Law 7-148, § 2(a), 35 D.C. Reg. 5427 (July 15, 1988) (through Oct. 1, 1991); D.C. Law 13-130, § 2, 47 D.C. Reg. 2688 (Apr. 21, 2000) (through Oct. 1, 2005); see also PRDSF, ¶ 7.  Since 1977, consequently, the District has prohibited full-service stations from being "structurally altered, modified, or otherwise converted . . . into a nonfull service facility."  D.C. Code § 36–304.01(b) (2014); see also D.C. Law 1–123, § 5-301, 24 D.C. Reg. 2371 (Apr. 19, 1977).  It has also barred operators of such stations from "substantially reduc[ing] the number, types, quantity, or quality of the repair, maintenance, and other services . . . offered" and required them to provide "a qualified individual . . . capable of performing repair, maintenance, and service work . . . during a reasonable number of hours per day and of days per week."  D.C. Code § 36–304.01(c) (2015); see also D.C. Law 1–123, § 5-301, 24 D.C. Reg. 2371 (Apr. 19, 1977).

When it purchased the lot in 2005, therefore, Petworth should have known that it could not convert the business to a non-full-service station.  That is not the dispute here, however.  Petworth's problems began in earnest in 2015 when the D.C. Council amended the RSSA to prohibit any full-service station from being "discontinued" or "converted . . . into any other use."

3

D.C. Law 20-271, § 211, 62 D.C. Reg. 1884 (Feb. 13, 2015).  Following these amendments, the

RSSA provided: "No retail service station which is operated as a full service retail service station

. . . may be <u>discontinued</u>, nor may be structurally altered, modified, or otherwise converted,

irrespective of the type or magnitude of the [change] . . . into a nonfull service facility <u>or into any</u>

<u>other use</u>."  D.C. Code § 36–304.01(b) (2015) (emphasis added to amendments).  As a result,

Petworth now was barred not only from reducing the station's offerings, but also from

converting it into anything else — *e.g.*, residential property or some other commercial or retail

use.

One safety valve remained: an aggrieved full-service-station owner could seek an

exemption by petitioning the Gas Station Advisory Board, a five-member body that reviewed

petitions and recommended whether the Mayor should grant the request.  <u>See</u> D.C. Code § 36–

304.01(d)–(e) (2015).  By at least 2015, however, this exemption process was illusory since the

Board had no members.  <u>See</u> ECF No. 59 (Pl. Reply) at 31; <u>see also</u> ECF No. 1-3 (Attorney

General's 2017 Letter on District's Retail Station Conversion Ban) at 1, 4 n.14 (noting that

Board was dormant, with no members appointed since 2006).

Dissatisfied with this freeze of its property, Petworth brought this suit in January 2018

against Mayor Muriel Bowser, Attorney General Karl A. Racine, District of Columbia

Department of Energy & Environment Director Tommy Wells, and the Gas Station Advisory

Board.  <u>See</u> ECF No. 1 (Complaint) at 1.  Plaintiffs sought a declaration that the RSSA, as

amended in 2015, violates the Fifth and Thirteenth Amendments to the United States

Constitution, as well as an injunction barring its enforcement.  <u>Id.</u> at 10.  Defendants moved to

dismiss, <u>see</u> ECF No. 6 (Def. MTD), and the Court granted that Motion as to the Thirteenth

Amendment claim alone.  Petworth Holdings, LLC, 308 F. Supp. 3d at 350, 358.  The takings cause of action thus remains.

With this litigation pending, the D.C. Council in 2019 again amended the RSSA and in two ways: it removed the prohibition on the discontinuation of full-service stations (but kept the bar on conversion to any other use), and it modified the exemption process by directing petitioners to the Director of the Department of Energy & Environment, as opposed to the Gas Station Advisory Board.  See D.C. Law 22-289, § 2, 66 D.C. Reg. 1665 (Feb. 8, 2019).  Under the new regime, DOEE can grant petitions for exemptions when "[t]he operator of the full service retail service station is experiencing extreme financial hardship" and "[a]nother full service retail service station exists within one mile of the station which provides equivalent service facilities."  D.C. Code § 36–304.01(d)(3)(A); see also id. § 36–304.01(d)(3)(B) (requiring DOEE to give "due weight to the views of the community and the affected [Advisory Neighborhood Commission]").

Subsequent to this change, Plaintiffs moved to amend their Complaint to add the District of Columbia as a defendant and a new claim for damages under 42 U.S.C. § 1983.  See ECF No. 35 (Motion to Amend).  The Court granted this motion, which made no reference to the District's 2019 amendments.  See Petworth Holdings, LLC, 333 F.R.D. at 298.  Nor did the Amended Complaint.  See ECF No. 41 (Am. Compl.).  This pleading thus still targets the 2015 RSSA. See, e.g., id., ¶¶ 22–23 (quoting 2015 RSSA); id., ¶¶ 31–36 (discussing 2015 RSSA's exemption process); id., ¶¶ 37–41, 44–45 (focusing on effect of RSSA, as modified by 2015 amendments). Procedural history in the rearview mirror, the Court now turns to the parties' pending Cross-Motions for Summary Judgment.

## II.      Legal Standard

"When faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Family Trust of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (cleaned up) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)). Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). To defeat summary judgment, however, the opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations,

or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. Navy, 813 F.2d 1236, 1241–42 (D.C. Cir. 1987).

If the Court determines that one party is not entitled to summary judgment, it "changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has just given to the movant's opponent.'"  Nucap Indus., Inc. v. Robert Bosch LLC, 273 F. Supp. 3d 986, 998 (N.D. Ill. 2017) (quoting Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund, 778 F.3d 593, 603 (7th Cir. 2015)).  It is nonetheless still possible for a court to grant motions in part or deny summary judgment to both sides.

## III.   Analysis

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  It "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. United States, 364 U.S. 40, 49 (1960).  It does not completely prohibit the taking of property, but instead proscribes takings without just compensation.  Brown v. Legal Found. of Wash., 538 U.S. 216, 235 (2003); see also First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A., 482 U.S. 304, 315 (1987) (Takings Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking").  When property is taken without just compensation, the owner can bring her claim in federal court under 42 U.S.C. § 1983, as Petworth does here.  Knick v. Twp. of Scott, 139 S. Ct. 2162, 2168, 2170 (2019).

7

Before embarking on the parties' arguments, it is important to have a clear view of Petworth's actual claims.  To challenge allegedly unconstitutional takings, litigants ordinarily bring an as-applied cause of action, which considers the "the particular impact of government action on a specific piece of property" and "requires the payment of just compensation." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 494 (1987); see also Knick, 139 S. Ct. at 2168, 2170.  Litigants may also, or alternatively, take on the "uphill battle" of raising a facial challenge by alleging that the "mere enactment of a statute constitutes a taking." Keystone Bituminous Coal Ass'n, 480 U.S. at 494–95; see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 320 (2002) (considering facial claim); see generally Goodwin v. Walton Cnty. Fla., 248 F. Supp. 3d 1257, 1265 (N.D. Fla. 2017) (considering differences between facial and as-applied takings claims).  Petworth brings both, alleging that the RSSA is unconstitutional on its face and as applied to its property.  See Am. Compl. at 11–12 (seeking, *inter alia*, injunction barring enforcement of RSSA generally and "specifically barring Defendant . . . from enforcing the penalty provisions . . . against Plaintiff[]"); ECF No. 51-1 (Pl. MSJ) at 28–29 ("The RSSA . . . is unconstitutional on its face . . . ."); id. at 16 (contending that RSSA, as applied to Petworth, has caused it to "suffer[] a permanent physical invasion of its property") (emphasis removed).

Because the District amended relevant portions of the RSSA while this lawsuit was pending, the Court will start with the 2015 version of the Act before considering the effect of the 2019 amendments.  This is because even if the latest amendments cured the problem, a taking could still have occurred in the interim, which could merit compensation.

A.  2015 RSSA

As amended in 2015, the RSSA prohibited any full-service station from being "discontinued" or "converted . . . into any other use."  D.C. Code § 36–304.01(b) (2015).  The Court will first take a slight detour to consider the District's threshold position regarding exhaustion before looking under the hood of the parties' arguments about whether those amendments imposed a taking.

1.  *Exhaustion*

The city initially maintains that Petworth's suit cannot even leave the garage because Plaintiff did not exhaust the administrative process to seek an exemption before filing suit.  See ECF No. 60-1 (Def. MSJ) at 2, 29–31; see also ECF No. 61 (Def. Reply) at 24–25.  Petworth responds that following the Supreme Court's decision in Knick v. Township of Scott, 139 S. Ct. 2162, exhaustion of state remedies is no longer required for suits brought under section 1983. See Pl. Reply at 31.  While the parties speak in the language of exhaustion, their arguments actually sound in ripeness.  E.g., Knick, 139 S. Ct. at 2169 (describing requirement that plaintiff seek variance before filing federal suit as issue of ripeness); see also Rumber v. District of Columbia, 487 F.3d 941, 944–45 (D.C. Cir. 2007) (discussing "ripeness requirements").  To the extent that the District's argument relates to exhaustion alone, Petworth is right: the Fifth Amendment imposes no exhaustion requirement for takings claims brought via section 1983, nor facial claims.  Knick, 139 S. Ct. at 2167 ("[T]he settled rule is that exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983.") (cleaned up) (citations omitted); Patsy v. Bd. of Regents, 457 U.S. 496, 504 (1982) (section 1983 provides "immediate access to the federal courts"); see also Suitum v. Tahoe Reg'l Plan. Agency, 520 U.S. 725, 736 n.10

9

(1997) (facial challenge generally can be brought when law is passed).  The Court will nonetheless consider Defendants' arguments as if they contested ripeness.

The ripeness doctrine's road begins with the Supreme Court's decision in <u>Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City</u>, 473 U.S. 172 (1985), where the Court articulated two preconditions for a ripe, as-applied takings claims.  First, a finality requirement: an as-applied takings challenge to a local land-use regulation is "not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." <u>Id.</u> at 186. Second, a state-litigation requirement: the as-applied claim is not ripe if the plaintiff "did not seek compensation through the procedures the State has provided for doing so." <u>Id.</u> at 194.  The Supreme Court eliminated the latter in <u>Knick</u>, declining to opine on the former.  <u>See</u> 139 S. Ct. at 2169–70.

What remains is the finality requirement.  <u>E.g.</u>, <u>Pakdel v. City & Cnty. of San Francisco</u>, 952 F.3d 1157, 1160 (9th Cir. 2020) (finding same).  Unlike facial challenges, which "are generally ripe the moment the challenged regulation of ordinance is passed," <u>Suitum</u>, 520 U.S. at 736 n.10, a federal court cannot hear an as-applied claim until the government has reached that final decision on how the law applies to the land at issue — in other words, the claim is not ripe until the government has decided whether to act in a manner that could constitute a taking. <u>Williamson Cnty.</u>, 473 U.S. at 191, 194.  A plaintiff thus must seek available exemptions before bringing an as-applied suit, as that process may save the land from being taken.  <u>Id.</u> at 192–94. Here is where the District's exhaustion arguments become relevant.

As the Court has previously explained in considering Petworth's standing to bring suit, it is clear that the RSSA applies to the property.  <u>Petworth Holdings, LLC</u>, 308 F. Supp. 3d. at 353.

The District does not now argue otherwise.  Its sole contention is that Petworth failed to apply
for relief from the RSSA.  See Def MSJ at 29–31; Def. Reply at 24–25.  When Plaintiffs filed
suit, however, such relief was unavailable because the very Board that they needed to petition
existed in name only.  See Attorney General's Letter on District's Retail Station Conversion Ban,
at 1, 4 & n.14 (noting that Board had no members and was nonoperational).  Because there were
no actual hoops Petworth could jump through, it could not effectively seek an exemption.
Plaintiff's as-applied claim is thus ripe.

The District protests that, instead of applying to the non-existent Board, Petworth should
have gone straight to the Mayor, who was charged with granting exemptions.  See D.C. Code
§ 36–304.01(d)(1)(C) (2015) ("The Mayor, in agreement with the Board, grants the
exemption.").  But that is not what the statute said.  The RSSA was clear: Petworth had to file its
petition with the Board.  Id. § 36–304.01(d)(1)(A) ("An exemption may be granted to the
prohibitions . . . if . . . [a] petition for exemption has been filed with the Gas Station Advisory
Board . . . ."); id. § 36–304.01(d)(2)(A) ("To be considered for an exemption . . . petitioners must
file a petition with the Board . . . .") (emphasis added).  Only once the Board completed its
review and provided a recommendation to grant an exemption could the Mayor do so.  See id.
§ 36–304.01(d)(1)(B) (requiring Board to "make[] a determination . . . that an exemption should
be granted and make[] a recommendation to the Mayor to grant the exemption"); see also D.C.
Code § 36–304.01(d)(1)(C).  Contrary to the District's contention, then, Petworth could not have
received an exception by direct application to the Mayor.

The District nonetheless attempts to jump start its argument by turning the Court's
attention to the 2019 amendments to the RSSA.  Plaintiff, says the city, could now apply to the

DOEE Director for an exemption.  See D.C. Code § 36–304.01(d)(3) (2019).  While this may be true, it has no effect on Petworth's pre-2019 takings claim.

      2.  *Taking*

The Supreme Court has recognized a few types of unconstitutional takings, including (1) "physical takings," which are government actions that cause a "permanent physical occupation of real property," Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427 (1982); see also Tahoe-Sierra, 535 U.S. at 324 (collecting cases); and (2) "regulatory takings," which are restrictions on uses of private property that go "too far."  Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, (1922); see also Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978).  Petworth maintains that the RSSA is a taking without just compensation under both theories, each of which is subject to a distinct analysis.  See Horne v. Dep't of Agric., 576 U.S. 350, 364 (2015) (cautioning against confusing physical and regulatory takings analyses); see also Tahoe-Sierra, 535 U.S. at 323.  It further contends that, even if the 2019 RSSA remedied the unconstitutional portion of the 2015 RSSA, the District still imposed a temporary physical taking.  See Pl. MSJ at 26–27; Pl. Reply at 23. Whereas Petworth moves for summary judgment only as to the physical taking, see Pl. MSJ at 2, the District asks for judgment on both forms of the claim.  See Def. MSJ at 5, 7.  Finding a physical taking, the Court need go no further at this juncture.

Petworth does not argue that the District has appropriated its property by taking actual title.  See Pl. MSJ at 9–13.  It contends instead that the city imposed a physical occupation of its land because it "destroyed Plaintiff's right to exclude the general public from its Property and effectively [gave] the public an easement to access and traverse the Property at will."  Id. at 11. Defendants rejoin that the RSSA cannot impose a physical taking because Petworth "retains full

title to the Property in fee simple and no third party has been authorized to build or otherwise encroach on it."  Def. MSJ at 2, 5–7.  The Court agrees with Petworth.  In doing so, it notes that when it previously reflected that the RSSA "falls short of a direct 'physical appropriation of [Plaintiff's] property,'" it did so merely in passing and expressly declined to analyze whether the RSSA imposed a physical occupation or invasion.  See Petworth Holdings, LLC, 308 F. Supp. 3d at 355–56 (quoting Keystone Bituminous Coal Ass'n, 480 U.S. at 489).

As used in the Fifth Amendment, the word "property" "includes the entire group of rights inhering in the citizen's ownership."  PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 82 n.6 (1980) (cleaned up) (quoting United States v. General Motors Corp., 323 U.S. 373 (1945)).  Because "[t]he power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights," Loretto, 458 U.S. at 435, a government-mandated physical occupation of private land requires payment of just compensation.  E.g., id., Kaiser Aetna v. United States, 444 U.S. 164, 179–80 (1979) (noting that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation"); cf. Byrd v. United States, 138 S. Ct. 1518, 1527 (2018) ("One of the main rights attaching to property is the right to exclude others.") (citation omitted).  A property "owner suffers a special kind of injury" when a government mandate enables "a stranger [to] directly invade[] and occup[y] the owner's property."  Loretto, 458 U.S. at 436.

The Court is aware that physical takings are "relatively rare."  Tahoe-Sierra, 535 U.S. at 324.  They occur where "government physically takes possession of an interest in property for some public purpose," id. at 322, or otherwise "requires the landowner to submit to the physical occupation of his land."  Yee v. City of Escondido, Cal., 503 U.S. 519, 527 (1992) (emphasis

removed).  Mere regulation of an owner's use of her property does not, without more, fall within the "very narrow" category of physical takings.  Bldg. Owners & Managers Ass'n Int'l v. FCC, 254 F.3d 89, 97 (D.C. Cir. 2001).

Just compensation is thus necessary when, for example, the government requires property owners to permit third-party cable television companies to install cable facilities on a building, Loretto, 458 U.S. at 422, or requires owners to submit to a public easement on their property. Nollan v. California Coastal Com'n, 483 U.S. 825, 831 (1987) (finding taking where government gives public "a permanent and continuous right to pass to and fro"); Chmielewski v. City of St. Pete Beach, 890 F.3d 942, 947 (11th Cir. 2018) (finding permanent physical taking where municipality encouraged public access to and hosted public events on private, beachfront property, and declined to enforce trespassing laws upon owner's request).  Whereas a limited restriction on an owner's "right to exclude" does not necessarily constitute a taking, e.g., PruneYard Shopping Ctr., 447 U.S. at 82–86 (no taking where law required shopping mall, otherwise open to public, to allow peaceful, political leafletting on property), a permanent "eviscerat[ion]" of an owner's "right to exclude" does.  Dolan v. City of Tigard, 512 U.S. 374, 384, 394 (1994) (concluding hypothetical public easement would, "[w]ithout question," be a taking).

As explained above, the Act — as it existed between 2015 and 2019 — banned full-service stations from being "discontinued."  D.C. Code § 36–304.01(b) (2015).  The Supreme Court's analysis in Nollan is instructive as to why such a prohibition imposes a physical taking. There, the Court had "no doubt there would have been a taking" had the government "required [plaintiffs] to make an easement across their [property] available to the public on a permanent basis."  483 U.S. at 831.  In doing so, the government would have taken the plaintiffs' right to

exclude by granting the public "a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual [would be] permitted to station himself permanently upon the premises."  Id. at 832; see also Dolan, 512 U.S. at 394; cf. Kaiser Aetna, 444 U.S. at 180 (noting, in considering regulatory taking, that "even if the Government physically invades only an easement in property, it must nonetheless pay just compensation").

The District acknowledges that a "requirement that the public have access" to private property "support[s] the finding of a taking," Def. Reply at 4 (discussing Nollan, 483 U.S. 825), but contends that the RSSA does not do so.  According to the city, under the RSSA, Petworth "would not have to admit a single member of the public onto the Property and, having admitted one, could exclude any other member it chose for any legal reason."  Id.  In other words, Plaintiff retained the very "right to exclude" that it argues it lost.  This position is running on empty. While Petworth can exclude some members of the public from its property, it cannot exclude all without violating the statute.

This becomes clear as one considers how the prohibition on discontinuation affects Plaintiff.  While a full-service station unaffected by a law like the RSSA could exclude the public from its land and shut down entirely, Petworth could not.  Not only was it required to "continue" providing full automotive services, it could not even "substantially reduce" those services, since they must be available "during a reasonable number of hours per day and of days per week."  D.C. Code § 36–304.01(c) (2015).  It is manifest that Petworth cannot "continue" its business without providing at least some members of the public access to its land.  This is no different from a beachfront landowner's being forced to provide an easement across her property to even limited members of the public.  The prohibition on discontinuation thus goes beyond

15

mere regulation; it limits Petworth's use of its land to a single purpose that necessitates public access and prohibits it from ever ceasing that service.  The 2015 RSSA thus took Petworth's "right to exclude" by mandating a physical invasion of its private land without providing just compensation.

Finding this physical taking, however, is only the first stop in Petworth's journey to obtaining just compensation.  The Court must also determine whether the 2019 amendments, which are addressed next, have rendered any taking only temporary.

B.  2019 RSSA.

The 2019 amendments are significant here because Petworth acknowledges that if they have cured any taking that previously existed, they thus rendered it temporary, rather than permanent.  See Pl. MSJ at 26.  The Court concludes they have.  As the attentive reader will recall, the D.C. Council in 2019 removed the prohibition on "discontinu[ing]" full-service stations and provided an administrative process to request exemptions.  See D.C. Law 22-289, § 2, 66 D.C. Reg. 1665 (Feb. 8, 2019).  While Plaintiff, perhaps coincidentally, amended its Complaint after this modification, the new pleading did not mention the 2019 change or update its takings claim.

The removal of the ban on discontinuation provides reason for the Court to pump the brakes on any as-applied or facial challenge.  Petworth counters that this amendment has no material effect on its position and thus asks the Court to find a permanent taking.  See, e.g., Pl. MSJ at 26 ("Plaintiff is forever barred from developing the Property or converting it in to any other use . . . ."); Pl. Reply at 21 (maintaining that, following 2019 amendment, "it is apparent that the law still prohibits discontinuance of full-service retail service stations").  It explains that RSSA's conversion ban, when read in combination with its subsection regulating business

16

operations (*e.g.*, requiring the provision of a mechanic and prohibiting substantial reductions in services), still bars it from ceasing operations.  See D.C. Code § 36–304.01(c).  The Court finds that such position has little horsepower.

This is not a case where the District amended some unrelated portion of the statute: the updated law removes the very word that led the Court to conclude that the 2015 RSSA imposed a physical taking of Petworth's property.  See *supra* at 14–16.  Put simply, the Act's express language no longer prevents discontinuation.  It is true that a subsection of the RSSA does ban the substantial reduction in the repair and maintenance services full-service stations provide.  See D.C. Code § 36–304.01(c).  But this language has been part of the law since 1977, see D.C. Law 1–123, § 5-301, 23 D.C. Reg. 5900 (Feb. 11, 1977), and was not contemporaneously interpreted to prohibit full-service stations from going out of business entirely.  See Opinions of the Corporation Counsel (Jan. 6, 1981), 1981 D.C. AG LEXIS 1, *2 ("[N]othing in [the RSSA] would prohibit one from razing a full service retail station and simply going out of business.").  If the RSSA had prohibited full-service stations from closing since 1977, moreover, the District's 2015 addition of the word "discontinued" would have been surplusage.  The Court declines to presume that the District expends such energy on nugatory amendments.  See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotation and citation omitted).

For the same reasons, it cannot conclude that the RSSA's continued prohibition against conversions to other uses — while quite restrictive — imposes a ban on closing the business.  Petworth provides no argument for why the sum of prohibitions on substantial reduction and on conversion to another use has some greater effect than the individual parts, and the Court sees

none.  Unlike the 2015 RSSA, the 2019 edition does not prohibit discontinuation of full-service stations and thus does not unconstitutionally mandate public access to Petworth's land.  This is because Petworth can, consistent with the law, discontinue its business.  It thus retains its right to exclude the public.

To be clear, the Court does not conclude that the 2019 RSSA is safe from all constitutional challenges.  It may well be that the prohibition on "conver[sion] . . . into any other use" goes "too far" and constitutes a regulatory taking.  Penn Coal Co., 260 U.S. at 415; see also Penn Central, 438 U.S. at 124.  The same would then hold true of that portion of the 2015 RSSA, too.  In this Opinion, the Court concludes only that the 2019 amendments to the RSSA sufficiently changed the law to render the District's physical taking temporary.  Just compensation on this theory is thus owed only for the 2015–19 period.

*C.*  Arkansas Game Taking

Although this would seemingly cut the engine on the Court's liability analysis, there is a spare argument in the trunk that no party mentions.  As if the law of takings were not sufficiently murky, it is possible that analyses of temporary takings should be conducted in a different manner.

In Arkansas Game & Fish Commission v. United States, 568 U.S. 23 (2012), the Supreme Court considered whether intermittent flooding could constitute a taking and emphasized that while "permanent" physical takings always require compensation, "temporary actions of the same character" are subject to a multi-factor analysis.  Id. at 26, 32–34, 38–39.  Whether courts should apply this framework to determine whether any temporary physical invasion is a taking (rather than merely whether floods or more intermittent physical invasions

are) remains unclear.  Id. at 38 ("We rule today, simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection.").

As a result, to be thorough, the Court will now briefly consider the 2015 RSSA under the Arkansas Game framework.  That analysis looks to the duration of the regulatory restriction, "the degree to which the invasion is intended or is the foreseeable result of authorized government action," "the character of the land at issue and the owner's 'reasonable investment-backed expectations,' regarding the land's use" and the "[s]everity of the interference."  Id. at 38–39 (citations omitted).  Viewing the facts in the light most favorable to the government, the outcome is the same as under the traditional physical-taking test described above: the 2015 RSSA imposes a temporary physical taking and just compensation is owed.  The Court will analyze the Arkansas Game factors in turn, grouping some where the analysis is related.

The duration factor runs to Petworth's benefit.  The physical invasion at issue lasted from May 2, 2015, until the 2019 amendments became effective on April 11, 2019.  See D.C. Law 20-271, § 211, 62 D.C. Reg. 1884 (Feb. 13, 2015); DRPSF, ¶ 41; D.C. Law 22-289, § 2, 66 D.C. Reg. 1665 (Feb. 8, 2019); DRPSF, ¶ 53.  This term of years is greater than shorter periods courts have concluded impose temporary takings.  See Tahoe-Sierra, 535 U.S. at 341–42 (acknowledging that development moratoria of longer than one year could impose taking); United States v. Pewee Coal Co., 341 U.S. 114, 115 (1951) (taking where government possessed and operated coal mine for approximately five months); Kimball Laundry Co. v. United States, 338 U.S. 1, 3–4 (1949) (condemnation of almost three and one-half years); Caquelin v. United States, 959 F.3d 1360, 1362 (Fed. Cir. 2020) (180 days).

"[T]he degree to which the invasion is intended or is the foreseeable result of authorized government action" — whether one factor or two — also indicates a taking.  It is plain that the

District intended for the public to have access to privately owned land that hosts a full-service

station.  It specifically amended the RSSA to ensure that members of the public would have

access to such stations — like the one on Petworth's land.  See Def. MSJ at 15 (Council's

extensions and amendments to RSSA "ha[ve] made clear that it considers the preservation of

full-service gas stations an important service to residents of the District of Columbia.").  In the

same vein, unlike a spontaneous flood or other unplanned event, the public use of Petworth's

private land was foreseeable.  See Arkansas Game, 568 U.S. at 39 (citing John Horstmann Co. v.

United States, 257 U.S. 138, 144–46 (1921), which found no taking where, even if there was

"causal connection" between government action and resulting rise of water in lakes, the harm

"could not have been "foreseen").  "There was no inadvertence here."  Banks v. United States,

138 Fed. Cl. 141, 150 (Fed. Cl. 2018) (finding taking from government imposition of railroad

right-of-way easement).  "[T]he continuous public trespassing and occupation of their property

was the natural and intended effect of the City's actions."  Chmielewski, 890 F.3d at 950

(easement).

The restriction, moreover, was quite severe.  Arkansas Game, 568 U.S. at 39–40.  As the

Court previously explained, Petworth's inability to close its property to the public led it to lose

its "right to exclude," "a fundamental element of the property right."  Kaiser Aetna, 444 U.S. at

179–80; see also supra at 14–16.  While the government did not take title to Petworth's property,

and Plaintiff did not lose access to its own land, the 2015 RSSA "eviscerate[d]" Petworth's

"right to exclude."  Dolan, 512 U.S. at 394.

The Supreme Court provided little guidance on how courts should weigh "the character

of the land at issue" in the balance.  Arkansas Game, 568 U.S. at 39.  Some have considered the

land's susceptibility to the particular invasion — e.g., flooding.  See Caquelin, 140 Fed. Cl. at

581; see also Ideker Farms, Inc. v. United States, 151 Fed. Cl. 560, 586–87 (Fed. Cl. 2020) (asking how flood changed character of land); Wilkie v. City of Boiling Spring Lakes, 263 N.C. App. 413, 2018 WL 6613993, at *6 (N.C. Ct. App. 2018) (same for loss of shoreline).  Courts have also noted that, when the government takes an easement, mere susceptibility is not determinative.  See In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs, 146 Fed. Cl. 219, 249 n.18 (Fed. Cl. 2019) (concluding that, despite land's susceptibility to flooding, "the character of the land at issue in this case is most simply described as private property not subject to a flowage easement"); cf. Banks, 138 Fed. Cl. at 150 (finding factor "immaterial" to liability, with "potential relevance" only to compensation owed, where government took easements).  Given that this is not a flooding case, most of these precedents offer little guidance; indeed, it is unclear whether this factor is even relevant in a case such as this.  In any event, it is hard to argue that it clearly supports the city.

As to Petworth's "reasonable investment-backed expectations."  Arkansas Game, 568 U.S. at 39, the parties dispute whether its development plans (which remain barred under the 2019 RSSA's prohibition on conversion to another use) were reasonable.  The Court need not resolve that issue.  Even if it assumes that this factor favors the District, the remainder weigh heavily on Petworth's side of the scale and support, in the balance, finding a temporary taking. Cf. First English, 482 U.S. at 321 ("Where the government's activities have already worked a taking of all use of property, no subsequent action by the government" — whether "amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain" — "can relieve it of the duty to provide compensation for the period during which the taking was effective.").

**IV.    Conclusion**

There remain the questions of exactly what compensation Petworth is owed for the constitutional violation that lasted from 2015 to 2019 and how the parties wish to proceed in regard to Plaintiff's <u>Penn Central</u> claim.  The Court will thus set a hearing to discuss the next phase of the litigation.  At this point, it will grant in part and deny in part each side's Cross-Motion as to the physical taking.  It also dismisses — at Defendants' request and without opposition — all Defendants except the District of Columbia.  A separate Order so stating will issue this day.


<u>/s/</u> *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>March 26, 2021</u>